973 P.2d 1171

**STATE of Arizona, Appellee.**

v.

**Kyle David SHARP, Appellant.**

**No. CR–97–0145–AP.**

Supreme Court of Arizona,
En Banc.

Jan. 28, 1999.

Grant Woods, The Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Eric J. Olsson, Assistant Attorney General, Criminal Appeals Section, Tuscon, Attorneys for Appellee.

Carla G. Ryan, Tuscon, Attorney for Appellant.

## OPINION

McGREGOR, J.

¶ 1    Appellant Kyle David Sharp appeals his conviction and death sentence for first-

degree premeditated and felony murder.[1] We review this case on direct, automatic appeal pursuant to Arizona Revised Statutes ("A.R.S.") § 13–4031. For the following reasons, we affirm Appellant's conviction and sentence.

## I.

¶ 2 On the afternoon of June 30, 1995, Appellant, a 24–year–old Indiana native in the midst of a road trip through the American West, checked into Room 204 of the Sands Motel in Willcox, Arizona. Appellant spent the evening drinking, playing pool, and smoking marijuana at two local bars. After closing time, at approximately 1:30 a.m. on July 1, 1995, Appellant returned to his room and requested extra towels from the motel manager, Judith A. Coughlin. When Ms. Coughlin delivered the towels to Room 204, Appellant held her in the room against her will. He then beat her, stripped her, sodomized her, and ultimately strangled her to death.

¶ 3 At approximately 2:00 a.m., Ms. Coughlin's ten-year-old stepson, Brandon Coughlin, heard two screams and pounding footsteps coming from the room directly above him, Room 204. When Brandon could not find his stepmother on the hotel premises, he ran one block to a Circle K and expressed his concerns to the store clerk, who called the Willcox Police Department.

¶ 4 Officer Glenn Childers, the first police officer on the scene, arrived at the Circle K at approximately 2:05 a.m., and immediately drove with Brandon to the Sands Motel. Officer Childers then knocked repeatedly on the door of Room 204, but no one responded. He peered through a gap in Room 204's curtains and observed a shadowy figure by the flickering light of the television set. At that point, someone inside the room slowly closed the curtains. Officer Childers then tried calling Room 204 from the front desk downstairs, but no one answered the telephone. At that time, Brandon gave Officer Childers a master key to the motel's rooms.

¶ 5 At 2:20 a.m., Officer Childers called his supervisor, Officer Jacob Weaver. Officer Weaver instructed Officer Childers to knock again, identify himself as a police officer, and call back if he received no response. When no one in Room 204 responded to Officer Childers' second knock, he called Officer Weaver, who arrived on the scene at approximately 2:40 a.m. Both officers banged on the door of Room 204 a third time, but still elicited no response. Officer Weaver then called Sergeant Kenneth Farnsworth, who instructed the pair to enter Room 204 with the master key. At 2:50 a.m., Officers Childers and Weaver, accompanied by a police dog, entered Room 204.

¶ 6 When they entered the room, they saw Appellant lying on the bed, apparently unconscious, and fully dressed except for his shoes. Appellant's luggage sat packed in front of the motel room door. The officers observed a hole in the wall and drywall particles on a nearby table. When Officer Weaver opened the door to the bathroom, he found the victim lying naked on the floor, face down, with a T-shirt wrapped around her neck. The victim had a black left eye and multiple bruises on her body. She was not breathing and had no pulse. Paramedics arrived on the scene within minutes, but were unable to revive the victim. She was pronounced dead at the hospital.

¶ 7 Upon discovering the victim's body, Officer Childers handcuffed Appellant as he lay on the bed. The paramedics, unable to awaken Appellant, then transported him to the hospital. Ostensibly believing Appellant may have suffered a drug overdose, police searched the bed for evidence of drug use. Officers found the victim's broken and bloodied eyeglasses and a pornographic magazine tucked between the mattresses.

¶ 8 Appellant awakened later that morning, handcuffed to the rails of his hospital bed. Mark Geyer, the registered nurse assigned to treat Appellant, questioned him for approximately thirty minutes. Sergeant

---

**1.** Appellant was also convicted of kidnaping and sexual assault and filed a Notice of Appeal from these convictions. Appellant failed to brief these issues on appeal, and they are automatically af-

firmed. *See State v. Greene,* 192 Ariz. 431, 444 n. 2, 967 P.2d 106, 119, n. 2 (1998); Ariz. R.Crim. P. 31.2.b.

Farnsworth, dressed in street clothes and a police department baseball cap, remained in the room while Geyer questioned Appellant and recorded the entire conversation on a microcassette recorder that he placed on the bedstand next to Appellant. During this questioning, Appellant admitted that he called the victim and requested she bring more towels to the room.

¶ 9 Hospital personnel took blood samples from Appellant and the victim for DNA analysis and drug testing. Semen found in the victim's anus matched Appellant's DNA type, and blood found in Appellant's shorts matched the victim's. Appellant's blood tested positive for alcohol, marijuana, and amphetamine/methamphetamine.[2] An autopsy showed that the victim had a lacerated anus, revealing she was conscious while being sodomized because the sphincter muscle was not relaxed during the assault. The victim's hyoid bone, the bone in the neck that supports the tongue, was fractured. The medical examiner determined the manner of death to be manual strangulation.

¶ 10 After a six-day trial, a jury convicted Appellant of kidnaping, sexual assault, and first-degree murder. All twelve jurors found Appellant guilty of both premeditated murder and felony murder. On the first two counts, kidnaping and sexual assault, the judge sentenced Appellant to twenty-one and fourteen years respectively. The judge sentenced Appellant to death on the first-degree murder count, finding that the killing was especially cruel, heinous, and depraved beyond a reasonable doubt and that no mitigating evidence, statutory or non-statutory, was sufficient to overcome the single aggravating factor.

## II.

¶ 11 Appellant appeals his first-degree murder conviction on eight separate grounds. For the reasons discussed below, we find none of Appellant's arguments persuasive and uphold the jury's verdict.

## A.

¶ 12 Appellant first argues that the trial court should have suppressed evidence officers discovered when they entered Room 204 without a search warrant. A trial court's ruling on a motion to suppress evidence will not be set aside absent a clear abuse of discretion. *See State v. Fisher*, 141 Ariz. 227, 236, 686 P.2d 750, 759 (1984). We conclude that the trial court did not abuse its discretion when it admitted the evidence because the emergency aid exception to the warrant requirement justified the officers' entry into Appellant's motel room.

¶ 13 The emergency aid exception to the warrant requirement allows law enforcement officers to enter a dwelling if they reasonably believe someone inside needs immediate aid or assistance. To fall within the emergency aid exception, a search must be motivated primarily by safety concerns and not by the desire to seize evidence. *Id.* at 237, 686 P.2d at 760.

¶ 14 Officers delayed entry into Room 204 for almost forty minutes after Officer Childers obtained a set of master keys. Delay alone, however, does not bar reliance on the emergency aid exception. In *Fisher*, this court found a forty-five minute delay reasonable because "[t]he trial court could reasonably have inferred that the delay was due to the police officers' reluctance to make a warrantless entry absent good reason to believe there was an emergency." *Id.* at 238, 686 P.2d at 761. The same reasoning applies here. Officers Childers and Weaver testified at the suppression hearing that they grew concerned because Ms. Coughlin was missing, screams were heard from Room 204, and no one would answer the door or the telephone. Given the cumulative impact of these facts, the trial court did not abuse its discretion when it determined that the officers acted properly when they reasonably believed an emergency existed to justify a warrantless entry into Room 204.

2. The hospital characterized the blood tests as "presumptive." The Arizona Department of Public Safety laboratory later conducted its own drug testing. The result of this second test indicated no presence of methamphetamine in Appellant's system.

B.

¶ 15 Appellant, citing *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), next argues that even if the initial entry into Room 204 was proper, the officers improperly conducted a warrantless search between the mattresses of Appellant's bed. Appellant contends that the trial court abused its discretion when it admitted evidence found during the search because the officers needed separate probable cause to conduct this separate intrusion into Appellant's privacy. In *Hicks*, the United States Supreme Court held that police actions in moving stereo equipment to locate serial numbers constituted a separate search that had to be supported by separate probable cause, even though the officers were lawfully present in the apartment where the equipment was located. *Id.* at 326, 107 S.Ct. at 1153. In this case, Appellant's unresponsive state gave police separate probable cause to inspect the immediate area surrounding Appellant for anything that might explain his condition and help medical personnel treat him.

¶ 16 Appellant asserts that police could not have been looking for materials to explain his medical condition because trial testimony suggests that the officers may have thought Appellant was feigning unconsciousness. The record reveals that the officers indeed were uncertain about Appellant's condition. Officer Weaver initially testified that Appellant appeared unconscious, but later testified that Appellant squinted and moved his eyelids while lying on the bed and seemed to stand on his own power when he was being carried from the motel room. Sergeant Farnsworth testified that Appellant walked with officers out of the motel room for approximately ten feet until his feet began to drag. Farnsworth further testified that when paramedics placed ammonia inhalant under Appellant's nose, Appellant tilted his head back and opened his mouth, and tears ran down his face. The bizarre scene the officers encountered when they entered Room 204, the outward signs of Appellant's unconsciousness, and the testimony of record, permit the conclusion that the officers were unable to determine at that time whether Appellant was truly unconscious or merely feigning his condition. Therefore, the trial court did not abuse its discretion when it determined that the officers had probable cause for the mattress search.

¶ 17 Furthermore, even if the trial court erred by admitting the results of the mattress search, the error was harmless. An error is harmless if the court is "satisfied beyond a reasonable doubt that the evidence did not impact the verdict." *State v. Romanosky*, 162 Ariz. 217, 223, 782 P.2d 693, 699 (1989). Given the overwhelming weight of the evidence against Appellant, including the physical evidence of his guilt and the facts that Appellant and Ms. Coughlin were the only people in Room 204 and the door was locked from the inside, the jury would have found that Appellant committed the murder beyond a reasonable doubt even if the eyeglasses and pornographic magazine had not been admitted into evidence. *See State v. Fulminante*, 161 Ariz. 237, 245, 778 P.2d 602, 610 (1988) (holding that admission of evidence is harmless if it is cumulative to other legitimately admitted evidence that establishes a defendant's guilt beyond a reasonable doubt).

C.

¶ 18 Appellant contends that the trial court impermissibly admitted into evidence his recorded, non-Mirandized statements to Nurse Geyer. This court reviews a trial court's decision to admit a defendant's non-Mirandized statements under an abuse of discretion standard. *See State v. Ross*, 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994). Statements stemming from a state actor's custodial interrogation of a defendant are not admissible unless he is warned of his Fifth Amendment "right to remain silent" and that "anything said can and will be used against [him] in court." *Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966).

¶ 19 The State concedes here that Appellant was in police custody when Nurse Geyer questioned him at the hospital. Even if a defendant is in custody, however, Miranda warnings are required when a med-

ical professional conducts an interrogation only if that medical professional is a state actor. *See Estelle v. Smith,* 451 U.S. 454, 468, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981) (holding that a defendant's jailhouse statements to a court-appointed psychiatrist could not be used against him in the penalty phase of a murder trial because the psychiatrist failed to give the defendant Miranda warnings). *See also State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981), *rev'd on other grounds, Vickers v. Ricketts,* 798 F.2d 369 (9th Cir.1986) (habeas corpus proceeding) (holding that the prosecution could not admit in its case-in-chief statements Vickers gave to a psychologist associate employed at the state prison because the employee failed to give Miranda warnings to Vickers before questioning him). Fulfilling the state action requirement is essential because the protections contemplated by the Fourteenth Amendment, and by incorporation of the Fifth Amendment, apply only to state actors, not to private parties. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)(affirming "the essential dichotomy" in the Fourteenth Amendment "between deprivation by the State, subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' against which the Fourteenth Amendment offers no shield") (citation omitted). *Id.*

¶ 20 Even if we were to regard Nurse Geyer as a state actor, any error in admitting Appellant's statements was harmless. First, as discussed above, the evidence of Appellant's guilt is overwhelming. Second, the only statement Appellant made to Nurse Geyer linking him to the murder was that he asked the victim to deliver towels to his room. Even if we regard this statement as inculpatory, independent evidence, namely the stack of towels found in Appellant's motel room, establishes that the victim went to Room 204 to deliver towels.

## D.

¶ 21 Appellant next argues that the State's description of the drywall particles found on a table in Room 204 as "white powder" constituted prosecutorial misconduct because the reference erroneously led jurors to believe the substance was cocaine or methamphetamine. This argument is meritless. In his opening statement, the prosecutor did mention white powder, but described it in his next breath as drywall and gypsum powder. At trial, the prosecution again mentioned the presence of white powder dust on a table, but testimony indicated that the corner of the table covered with the powder appeared to match a hole in Room 204's drywall. Hence, the State did not mislead the jury into believing the white powder was something other than drywall. Moreover, even if the State did somehow mislead the jury, Appellant waived his objection because he failed to make it at trial. *See State v. Kemp,* 185 Ariz. 52, 62, 912 P.2d 1281, 1291 (1996) (holding that instances of prosecutorial misconduct are waived if not objected to at trial).

## E.

¶ 22 Appellant also argues that the trial court abused its discretion when it admitted into evidence three pornographic magazines found in Appellant's motel room. The State contends that Appellant waived his objection to this evidence because he failed to object to its admission at trial. Because defense counsel filed a pre-trial motion to suppress the evidence, which the trial court denied, Appellant did not waive his objection. *See State v. Lindsey,* 149 Ariz. 472, 476, 720 P.2d 73, 77 (1986) (holding that an objection raised in a motion to suppress evidence preserves the issue for appeal despite the lack of further objection at trial). We therefore turn to the merits of the argument.

¶ 23 Pornographic materials are admissible at trial if the material is relevant to an issue in the case and the danger of unfair prejudice does not substantially outweigh the probative value of the evidence. *See State v. Grannis,* 183 Ariz. 52, 57, 900 P.2d 1, 6 (1995). Although the probative value of the pornographic magazines was limited, their admission was relevant to the issue of premeditation because the magazines tended to show that Appellant's motive in calling the victim up to his room was sexual. The danger of unfair prejudice also was lim-

ited because the pornographic magazines were cumulative to other evidence of sexual motive and premeditation. Moreover, no actual prejudice occurred because the prosecution did not emphasize this evidence at trial. Thus, the trial court did not err when it admitted the pornographic magazines.[3]

### F.

¶ 24 Appellant's next contention is that the trial court erred when it failed to conduct a new *Frye*[4] hearing in response to defense counsel's concern about the reliability of the RFLP method of DNA analysis as a science. This court already has determined already that RFLP methodology generally is accepted in Arizona as reliable. *See State v. Bible*, 175 Ariz. 549, 590, 858 P.2d 1152, 1193 (1993); *State v. Tankersley*, 191 Ariz. 359, 362, 956 P.2d 486, 489 (1998). We find no error.

### G.

¶ 25 Appellant also argues that the trial court should have inquired into the status of the relationship between Appellant and his attorney because two prospective jurors expressed concern about the adequacy of defense counsel before trial. We find this argument unpersuasive. First, the record fails to reflect that either defense counsel or Appellant ever told the trial court that the quality of their attorney-client relationship was unsatisfactory. Second, the trial judge took action when the jurors raised competency concerns. In the presence of counsel, the judge spoke with the two prospective jurors individually and explained that their task was to decide the case based on the evidence presented, not on their perception of the attorneys and their individual lawyering styles. The first prospective juror admitted that he was evaluating the attorney before he had heard the facts, and the second prospective juror stated that he could base his decision on the evidence presented despite his concerns. Following these conversations, the trial judge concluded that the jurors could render a fair and impartial verdict and did not dismiss them.

¶ 26 We review a trial court's determination that a juror can render a fair and impartial verdict under a clear abuse of discretion standard. *See State v. Lavers*, 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991). Prejudice will not be presumed, but must appear affirmatively from the record. *See State v. McDaniel*, 80 Ariz. 381, 298 P.2d 798 (1956). Given the facts here, the trial court did not abuse its discretion when it determined that each prospective juror could render a fair and impartial verdict.

### H.

¶ 27 Finally, Appellant argues that the trial court erred in failing to give the jury second-degree murder and voluntary intoxication instructions. These arguments also lack merit.

¶ 28 Appellant cites *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), for the proposition that the trial court was required to give the jury a second-degree murder instruction. In *Beck*, the Court held that the death penalty may not be imposed after a jury verdict of guilt of a capital offense unless the jury was permitted to consider a verdict of guilt of a lesser included offense when the evidence warrants it. *Id.* at 2389. In this case, Appellant refers us to no evidence that supports a second-degree murder instruction, and our own review of the record discloses none. Moreover, the Court's primary concern in *Beck* "was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad v. Arizona*, 501 U.S. 624, 646, 111 S.Ct. 2491, 2504, 115 L.Ed.2d 555 (1991).

---

3. Furthermore, had the trial court erred in admitting this evidence, the error would be harmless given the overwhelming evidence of Appellant's guilt. *See Romanosky*, 162 Ariz. at 223, 782 P.2d at 699; *Fulminante*, 161 Ariz. at 245, 778 P.2d at 610. ·

4. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

This trial court adhered to the mandate of *Beck* and *Schad* by giving jury instructions about the lesser offenses of kidnaping and sexual assault. Finally, we recognize no lesser included offense to felony murder. *See State v. Dickens*, 187 Ariz. 1, 23, 926 P.2d 468, 490 (1996).

¶ 29 Appellant also contends that *Vickers*, 798 F.2d at 369, required the trial court to give a second-degree murder instruction to the jury. In *Vickers*, the Ninth Circuit held that a judge must give a second-degree murder instruction if "the evidence at trial would have supported a second degree murder conviction." *Id.* at 371 (holding a second-degree murder instruction was required because the jury may have believed evidence from a defense expert that Vickers suffered from impulsive aggression as a result of an epileptic disorder). Unlike *Vickers*, however, counsel in this case presented no evidence to show that the killing could somehow fit the rubric of second-degree murder. All evidence points either to felony murder, given that the killing occurred in the course of a kidnaping and sexual assault, or to premeditated murder, given that Appellant called the victim to his room and brutally assaulted and strangled her before her death. Thus, the trial court did not err when it failed to give a second-degree murder instruction to the jury.

¶ 30 Appellant argues that the judge should have instructed the jury on voluntary intoxication because the jury could consider intoxication in determining Appellant's mental state. However, A.R.S. § 13–503 expressly states that voluntary, temporary intoxication is not a defense to any crime or culpable mental state. *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 n. 5 (1997). The trial court did not err when it refused to give a voluntary intoxication instruction.

### III.

¶ 31 Appellant contends that the trial court erred when it imposed the death penalty. For the following reasons, we uphold the decision of the trial court.

### A.

¶ 32 Appellant first argues that the trial court failed to properly weigh the aggravating and mitigating evidence. In accordance with A.R.S. § 13–703.01, we independently review the trial court's findings regarding aggravating and mitigating circumstances. *See State v. Djerf*, 191 Ariz. 583, 595, 959 P.2d 1274, 1286 (1998). We begin our analysis with the aggravating factors. The trial court found the presence of one aggravating factor, namely that Appellant murdered the victim in an especially cruel, heinous, and depraved manner. *See* A.R.S. § 13–703.F.6. We uphold the trial court's finding of cruelty and therefore need not reach the heinous/depraved issue. *See State v. Towery*, 186 Ariz. 168, 187, 920 P.2d 290, 309 (1996) (holding that a trial court's finding of cruelty beyond a reasonable doubt sufficiently establishes the F.6 factor).

¶ 33 The trial court found beyond a reasonable doubt that Appellant committed the crime in an especially cruel manner due to the great physical and emotional pain the victim suffered while she was sexually assaulted and murdered. A murder is especially cruel if the defendant inflicts physical pain upon the victim before her death. *See State v. Kiles*, 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993). This court previously has upheld a finding of cruelty when a defendant sodomized a victim and then strangled him to death. *See State v. Cook*, 170 Ariz. 40, 61, 821 P.2d 731, 752 (1991). The evidence here established beyond a reasonable doubt that the victim was conscious and suffered physical pain while she was brutally beaten, sodomized, and ultimately strangled. The victim incurred defensive wounds and scratched Appellant in a vain attempt to defend herself, showing that she anticipated her horrible fate and suffered mental anguish during the attack. Therefore, we uphold the trial court's finding of the F.6 aggravating factor.

¶ 34 We turn next to the mitigating evidence. In sentencing a defendant, the trial judge must consider all statutory mitigating factors and all relevant mitigating evidence a defendant proffers to determine whether it constitutes a non-statutory miti-

gating factor. *See State v. Gulbrandson,* 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). The trial court, however, has discretion to decide how much weight to give each mitigating circumstance that the defendant proves by a preponderance of the evidence. *See State v. Hyde,* 186 Ariz. 252, 282, 921 P.2d 655, 685 (1996).

¶ 35  Appellant argues that the trial court failed to consider or give sufficient weight to the following statutory and non-statutory mitigating factors: (1) diminished capacity to appreciate the wrongfulness of his conduct and conform his actions to the law due to mental impairment, childhood trauma, and substance abuse; (2) age; (3) police negligence; (4) lack of prior felony record; and (5) felony murder instruction given at trial. We address each of these mitigating circumstances separately.

¶ 36  The trial court rejected Appellant's assertion that he lacked the capacity to appreciate the wrongfulness of his conduct and experienced a diminished ability to conform his actions to the law when he committed the offense. *See* A.R.S. § 13–703.G.1. At his sentencing hearing, Appellant presented testimony from two psychologists, Dr. Thomas Streed and Dr. Joseph Geffen, in an attempt to show that he was suffering from a psychological phenomenon called agitated delirium when he committed the crime. According to Dr. Streed's testimony, agitated delirium is a condition that may result when one combines alcohol and methamphetamine, thereby causing the sufferer to become hyperthermic, psychotic, and then lethargic. In a state of agitated delirium, a person dissociates from reality and experiences diminished cognitive function. Neither psychologist could testify to any instance in which a person in a state of agitated delirium committed a sexual assault, and Dr. Streed testified that an individual's thoughtful destruction of evidence or concealment of a crime would contraindicate a diagnosis of agitated delirium.

¶ 37  Based on his limited knowledge of agitated delirium and his review of the facts, Dr. Geffen could not testify with any degree of certainty that Appellant was in a state of agitated delirium when he committed the crime. In contrast, Dr. Streed testified to a reasonable medical probability that Appellant suffered from this disorder the night of the murder even though Dr. Streed had no personal experience with agitated delirium. The trial judge, however, expressly found that Dr. Streed's testimony lacked credibility.

¶ 38  Some evidence in the record supports a finding of agitated delirium. Appellant appeared unconscious and was sweaty and hot when officers entered Room 204, which is consistent with a lethargic and hyperthermic state. Appellant also self-reported a history of blackouts associated with his use of drugs and alcohol.

¶ 39  On the other hand, substantial evidence supports the conclusion that Appellant was not suffering from agitated delirium and was not in a dissociative state when he murdered the victim. First, Appellant's blood alcohol level, measured at the hospital before he regained consciousness, was .085, a level less than the legal limit for intoxication. Second, the bartender who served Appellant drinks from approximately 11:00 p.m. until closing time testified that Appellant did not appear intoxicated, carried on a normal conversation with her, and did not stagger. Finally, Appellant took several steps to clean up and conceal evidence after the murder. He removed his bloody shorts, packed them in his suitcase, which was placed by the front door, and fully dressed himself except for his shoes. He closed the bathroom door to conceal the victim's body. He placed the victim's eyeglasses and a pornographic magazine between the mattresses, apparently to conceal them. He drew the curtains to his room to prevent the officers from observing his actions. These efforts support a finding that Appellant's cognitive function was quite intact after the killing and indicate that Appellant was not in a dissociative state or suffering from agitated delirium the night of the murder.

¶ 40  Appellant also presented evidence intended to show that he was unable to appreciate the wrongfulness of his conduct or conform his actions to the law due to his traumatic childhood and long history of sub-

stance abuse. Appellant reported to psychologists that he was sodomized by an older stepbrother from the age of five through thirteen. Appellant also reported that his stepfather was physically abusive and his natural parents were both alcoholics. Appellant further reported his own long history of alcohol and drug abuse.

¶ 41 Evidence of a childhood like that described above, no matter how horrific, cannot be given substantial weight as a statutory or non-statutory mitigating factor when the evidence is as limited as in this case. *See State v. Jackson*, 186 Ariz. 20, 31, 918 P.2d 1038, 1049 (1996). First, Appellant offered only self-reported evidence, which the trial court could not corroborate. This court has repeatedly held that self-reported evidence may be given little or no mitigating weight. *See State v. Gallegos*, 185 Ariz. 340, 344–45, 916 P.2d 1056, 1060–61 (1996) (discounting an expert's report of intoxication because it was based solely on the defendant's self-reporting); *State v. Murray*, 184 Ariz. 9, 45, 906 P.2d 542, 578 (1995) (rejecting historical substance abuse as a mitigating factor because evidence of the abuse was self-reported and uncorroborated); *State v. Stokley*, 182 Ariz. 505, 520–21, 898 P.2d 454, 469–70 (1995) (discounting an expert's opinion that the defendant's capacity to appreciate the wrongfulness of his conduct when he committed the crimes was diminished because it was based entirely on the defendant's self-reported alcohol consumption and blackout on the night of the murders).

¶ 42 Second, Appellant failed to show a causal connection between his traumatic childhood or history of substance abuse and his actions on the night of the murder. We have previously explained that we require a causal connection to justify considering evidence of a defendant's background as a mitigating circumstance. *See State v. Rienhardt*, 190 Ariz. 579, 592, 951 P.2d 454, 467 (1997) (holding that a history of substance abuse is only a mitigating factor when a causal connection exists between the alcohol and drug abuse and the crime); *State v. Jones*, 185 Ariz. 471, 490–91, 917 P.2d 200, 219–20 (1996) (holding that a chaotic and abusive childhood is only a mitigating factor with evidence of a

causal connection between the abuse and the crime). Because Appellant failed to establish a causal connection between his unfortunate childhood or his abuse of drugs and alcohol and his criminal actions, sympathy for those events does not justify allowing him to receive diminished punishment for this brutal murder.

¶ 43 Appellant also argues that the trial court should have considered his age as a statutory mitigating factor on the ground that he was immature and had difficulty relating well to women. *See* A.R.S. § 13–703.G.5. This court looks to "such factors as a defendant's intelligence and past experience to determine whether age is a mitigating circumstance." *State v. Atwood*, 171 Ariz. 576, 652–53, 832 P.2d 593, 669–70 (1992). Psychological testing revealed Appellant to be of average to above average intelligence. In addition, Appellant was twenty-four at the time of the murder, had been married, and was living an adult lifestyle. We agree with the trial court that Appellant's age is not a statutory mitigating factor.

¶ 44 Next, Appellant contends that the trial court erred when it failed to consider police negligence as a non-statutory mitigating circumstance. Appellant argues that law enforcement's forty-minute delay in entering Room 204 was negligent and must be considered a non-statutory mitigating factor because the victim's life might have been spared had officers entered sooner. We disagree.

¶ 45 According to the United States Supreme Court, a trial judge must "not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character and record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). *See also State v. Willoughby*, 181 Ariz. 530, 547, 892 P.2d 1319, 1336 (1995) (court must consider all mitigating aspects of a defendant's character and circumstances). The police delay in this case is not relevant, either to a circumstance of the offense or to any aspect of Appellant's character and record, and

therefore cannot be considered a mitigating factor. Moreover, although the officers' forty-minute delay in entering Room 204 delayed medical attention for the victim, paramedics did not find the victim alive, and no evidence in the record suggests that she would have been found alive had police acted more quickly. The victim died because Appellant strangled her, not because police delayed their entry into Appellant's motel room.

¶ 46 Appellant also argues that the trial court failed to give sufficient weight to Appellant's lack of a prior felony record as a non-statutory mitigating circumstance. It is true that Appellant had no felony convictions prior to the events of July 1, 1995. Appellant's criminal record does, however, include eight misdemeanor convictions. Given Appellant's long criminal history, his lack of a prior felony conviction deserves little mitigating weight in this case.

¶ 47 Appellant further contends the trial court erred when it failed to regard the giving of a felony murder instruction at trial as a non-statutory mitigating circumstance. We disagree. This court has held that a felony murder instruction "may be mitigating where there is some doubt as to a defendant's specific intent to kill." *State v. Henry*, 189 Ariz. 542, 552, 944 P.2d 57, 67 (1997). Appellant's actions in savagely beating and strangling the victim to death, however, undermine any argument that he did not intend to kill the victim. Moreover, the jurors unanimously found Appellant guilty of first-degree premeditated murder as well as felony murder, indicating that they found intent to kill. *See Atwood*, 171 Ariz. at 648–49, 832 P.2d at 665–66 (holding that the giving of a felony murder instruction is not a relevant mitigating circumstance when the defendant acted alone to kill the victim). We therefore conclude that the giving of a felony murder instruction is not a non-statutory mitigating circumstance.

¶ 48 After independently weighing the mitigating circumstances, we hold that these factors are insufficient to outweigh the finding of cruelty and affirm the decision of the trial court.

## B.

¶ 49 Appellant argues on two fronts that Arizona's capital sentencing scheme violates the Eighth Amendment. First, Appellant contends that Arizona's capital sentencing scheme does not provide standardization and gives prosecutors unfettered discretion to seek the death penalty. The United States Supreme Court has rejected this argument, and we need not consider it here. *See Gregg v. Georgia*, 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). Second, Appellant argues that execution by lethal injection constitutes cruel and unusual punishment. We have already rejected this argument, and we decline Appellant's invitation to reconsider our decision. *See State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

## C.

¶ 50 Appellant's final contention is that the trial court erred when it failed to conduct a proportionality review of Appellant's death sentence. We reject this argument. This court has explicitly held that trial courts should not conduct a proportionality review of a defendant's death sentence. *See State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

## IV.

¶ 51 For the foregoing reasons, we affirm Appellant's conviction and death sentence.

ZLAKET, C.J., and JONES, V.C.J., and FELDMAN and MARTONE, JJ., concur.