333 P.3d 774

**STATE of Arizona, Appellee,**

v.

**Bradley Harold WILSON, Appellant.**

**No. 1 CA–CR 13–0588.**

Court of Appeals of Arizona,
Division 1.

Aug. 19, 2014.

Arizona Attorney General's Office By Myles A. Braccio, Phoenix, Counsel for Appellee.

The Rigg Law Firm, P.L.L.C. By Brett R. Rigg, Pinetop, Counsel for Appellant.

Judge PETER B. SWANN delivered the opinion of the Court, in which Presiding Judge JOHN C. GEMMILL and Judge PATRICIA A. OROZCO joined.

## OPINION

SWANN, Judge.

¶ 1 This appeal requires us to decide whether the superior court erred by denying a motion to suppress evidence seized as the result of a warrantless search of a residence. We hold that the denial of the motion was error because the state failed to meet its burden to prove that a warrantless search was justified. We therefore reverse and remand.

### FACTS AND PROCEDURAL HISTORY

¶ 2 Defendant Bradley Harold Wilson was indicted for production of marijuana and possession of drug paraphernalia based on evidence seized from his home in Taylor, Arizona. Before trial, Defendant filed a motion to suppress the seized evidence. At a hearing on the motion, the state presented evidence of the following facts.

¶ 3 On the morning of August 28, 2011, police received a call that Defendant had approached a neighbor's home while naked and had tried to give the neighbor a bowl of old food and a dog leash. The responding officer, Brandon Gardner, found Defendant at his own house, then wearing jeans. Defendant told Gardner that he was fine and did not require medical attention. Gardner left Defendant's house and returned to the police station, where he obtained contact information for Defendant's son and spoke to the son by telephone.

¶ 4 That afternoon, police received a second call from neighbors who reported that Defendant was acting strangely. When Gardner and another officer, Les Shumway, arrived at Defendant's house, Defendant exited the house and closed the front door behind him. The door was secure and the house's front window, though broken, was covered by a board.

¶ 5 Observing that Defendant was acting "odd" and making nonsensical statements, the officers called for an ambulance. When the ambulance arrived, Defendant told the medical personnel that in the house, kept in a duct-tape-wrapped glass jar, was up to seven pounds of mercury. Defendant further stated that he had been handling the mercury for several years, that he and his family would play with it, that he had been licking and bathing in it, and that his house was dangerous and anyone who went inside might

be severely hurt. Based on these statements, Shumway became concerned that there could be mercury throughout the house.

¶ 6 Upon hearing Defendant's statements, the medical personnel called the fire department for assistance. Meanwhile, Gardner and Shumway learned from an onlooker that Defendant had recently suffered a divorce and the death of a parent, and had claimed that he was going to kill himself and his dog. They also learned that a neighbor had spent time at Defendant's house earlier that day and had left in Defendant's vehicle, claiming that Defendant had given it to him. Shumway located that neighbor and transported him back to Defendant's house. The fire department ordered both the neighbor and Defendant to disrobe, and rinsed them off. Defendant was then transported to a hospital. A nurse from the hospital later called the police to ask for more information about Defendant's statements and the mercury.

¶ 7 The chief of the fire department called one of the department's volunteer firefighters, Steven Hardy, for assistance regarding the mercury. Hardy, who had experience dealing with mercury spills through his position as safety analyst and fire chief at a power plant, arrived within a few hours. Gardner and Shumway told Hardy that there was a large amount of mercury spilled throughout the house. Hardy informed the officers that mercury is poisonous and can cause serious long-term health effects. After consulting by telephone with two other hazardous-materials experts, Hardy determined that the temperature that day "w[as]n't quite there [to the point of causing mercury vaporization] or just round there." Believing that it would have been "irresponsible ... to just walk away from [the situation] and not look into it further," Hardy asked the officers whether he could enter the house "to see if there was mercury, to see where it was at and how much there was, and get an idea of what we were actually dealing with." The officers agreed, reasoning in part that the hospital would need to know whether Defendant required treatment for mercury poisoning.

¶ 8 Shumway and Hardy entered the house together and spent about ten minutes looking in its "not very clean" rooms for mercury. In the living room, Shumway smelled an odor of marijuana that intensified as he approached the final room to be checked, an area in the laundry room that was shielded by a hanging blanket. Inside that area Shumway saw several marijuana plants. At that point, Shumway and Hardy exited the house and Shumway obtained a search warrant. When police reentered the house under the search warrant, they seized the marijuana plants as well as drug paraphernalia and firearms. Shumway saw "indication of mercury" related to a "box in a hallway" but could not confirm the presence of mercury. A week or two later, however, Defendant's son contacted Shumway, met Shumway and Hardy at Defendant's house, and surrendered a duct-tape-wrapped glass jar that he said contained mercury. Hardy noticed some mercury on the floor and told Defendant's family members that they needed to have it cleaned up.

¶ 9 The superior court concluded that the foregoing facts constituted exigent circumstances that justified Shumway and Hardy's warrantless entry into the house, and that the marijuana plants were in plain view from a lawful vantage point. The court therefore denied Defendant's motion to suppress and the matter proceeded to a bench trial. The court found Defendant guilty as charged, suspended the imposition of sentence, and imposed a two-year probation term.

¶ 10 Defendant timely appeals, contending that his motion to suppress should have been granted.

### STANDARD OF REVIEW

¶ 11 We review the denial of a motion to suppress for a clear abuse of discretion, viewing the evidence presented at the suppression hearing in the light most favorable to affirming the superior court's ruling. *State v. Moore,* 183 Ariz. 183, 186, 901 P.2d 1213, 1216 (App.1995). We defer to the court's factual findings, including its findings on credibility and the reasonableness of inferences drawn by law enforcement, but we review de novo mixed questions of law and

fact and the court's ultimate legal conclusions. *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19, 170 P.3d 266, 271 (App.2007).

## DISCUSSION

¶ 12 A warrantless search of a residence is unlawful under the Fourth Amendment of the United States Constitution unless an established exception to the warrant requirement applies. *State v. Fisher*, 141 Ariz. 227, 237, 686 P.2d 750, 760 (1984). It is the state's burden to show that an exception applies. *Id.; see also* Ariz. R.Crim. P. 16.2(b). Here, the state contends that several exceptions apply. We address each proposed exception in turn, and conclude that on this record the warrantless entry into Defendant's residence was not justified.

## I. THE WARRANTLESS ENTRY WAS NOT JUSTIFIED UNDER THE EXIGENT CIRCUMSTANCES EXCEPTION.

¶ 13 The state first contends that the warrantless entry was, as the superior court concluded, lawful under the exigent circumstances exception to the warrant requirement. Under this exception, a warrantless search is justified by probable cause coupled with exigent circumstances. *State v. Decker*, 119 Ariz. 195, 197, 580 P.2d 333, 335 (1978). Probable cause exists when the facts and circumstances give police "information sufficient to justify belief by a reasonable man that an offense is being or has been committed." *State v. Aguilar*, 228 Ariz. 401, 403, ¶ 14, 267 P.3d 1193, 1195 (App.2011). Exigent circumstances exist when "a substantial risk of harm to the persons involved or the law enforcement process would arise if the police were to delay a search until a warrant could be obtained." *State v. Greene*, 162 Ariz. 431, 433, 784 P.2d 257, 259 (1989) (citation omitted). Exigent circumstances include (but are not limited to) fires, medical emergencies, hot pursuits, possible crimes in progress, and situations that pose a possibility of violence. *Mazen v. Seidel*, 189 Ariz. 195, 197, 940 P.2d 923, 925 (1997); *State v. Soto*, 195 Ariz. 429, 431, ¶ 8, 990 P.2d 23, 25 (App.1999).

¶ 14 We hold that the superior court's application of the exigent circumstances exception was error. Based on Defendant's statements to medical personnel, the police reasonably could conclude that a considerable amount of mercury was spilled inside his house. *See State v. Sainz*, 18 Ariz.App. 358, 361, 501 P.2d 1199, 1202 (1972) ("[T]he business of police and firemen is to act, not to speculate or meditate on whether the report is correct."). And based on Hardy's statements, the police reasonably could conclude that the mercury was poisonous. But Hardy testified that possession of mercury is not illegal, and the record does not support the conclusion that there was probable cause to believe an imminent risk to health and safety existed inside the unoccupied house. Hardy determined that the ambient temperature was not high enough to cause the mercury to vaporize, and all evidence indicated that the house's doors and windows were closed. The police did not testify that they believed anyone was inside of the house, and the state did not present any other evidence to suggest that mercury spilled in the house threatened the immediate safety of any person. Because there was neither evidence of a crime nor evidence of an imminent threat to the health of any person or the public generally, the evidence was simply insufficient to support a warrantless entry under the exigent circumstances exception.

## II. THE WARRANTLESS ENTRY WAS NOT JUSTIFIED UNDER THE EMERGENCY AID EXCEPTION.

¶ 15 The state represents on appeal that it does not claim the warrantless entry was supported under the emergency aid exception. The state contends, however, that the entry was lawful because it was in furtherance of Defendant's medical treatment in view of an "exigent medical circumstance." We view the state's argument as describing a novel permutation of the emergency aid exception.

¶ 16 Under the emergency aid exception, police may enter a residence without a warrant when they have "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or proper-

ty," there is "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched," and the search is "not . . . primarily motivated by intent to arrest and seize evidence." *Fisher,* 141 Ariz. at 237–38, 686 P.2d at 760–61 (citation omitted). The exception may also justify a warrantless search of personal belongings when a person is "unconscious or otherwise unresponsive, is in need of emergency aid and the search is undertaken to facilitate the aid that might be necessary." *In re Tiffany O.,* 217 Ariz. 370, 376, ¶ 22, 174 P.3d 282, 288 (App.2007); *see also State v. Sharp,* 193 Ariz. 414, 420, ¶ 15, 973 P.2d 1171, 1177 (1999) (holding that after officers lawfully entered motel room under emergency aid exception and encountered defendant therein, defendant's "unresponsive state gave police separate probable cause to inspect the immediate area surrounding [him] for anything that might explain his condition and help medical personnel treat him").

¶ 17 Based on Defendant's bizarre behavior, the police reasonably could conclude that he was in need of medical attention. They also reasonably could conclude that additional information regarding his living environment could aid his diagnosis and treatment. But though Gardner testified that it was difficult to converse with Defendant because he "would get redirected . . . by himself," the state presented no evidence that Defendant was unconscious or unresponsive—indeed, it was Defendant himself who voluntarily informed medical personnel that he had been handling mercury. Further, the state presented no evidence that locating the mercury was necessary for Defendant's care. Though Gardner testified that a hospital nurse inquired about the mercury, nobody involved in Defendant's medical care ever suggested that finding the mercury was necessary to treat an exigent condition. The evidence did not support application of the emergency aid exception.

III. THE POLICE'S COMMUNITY–CARETAKING FUNCTION DOES NOT EXTEND TO WARRANTLESS ENTRIES INTO RESIDENCES.

¶ 18 The state finally contends that the warrantless entry was lawful because it was conducted pursuant to the police's community-caretaking function. The Supreme Court recognized the community-caretaking function in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady,* the Court stated that because motor vehicles and traffic are extensively regulated, and because vehicles may frequently become disabled or involved in accidents on public roads, "[l]ocal police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what . . . may be described as community-caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 S.Ct. 2523. The Court emphasized that there is a "constitutional difference between searches of and seizures from houses and similar structures and from vehicles," which "stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." *Id.* at 442, 93 S.Ct. 2523.

¶ 19 Consistent with *Cady,* we have held that a warrantless intrusion into a vehicle may be justified when reasonable to allow police to render aid, combat hazards, prevent potential hazards, and otherwise preserve and protect public safety. *State v. Mendoza–Ruiz,* 225 Ariz. 473, 475, ¶¶ 8–9, 240 P.3d 1235, 1237 (App.2010). Citing the community-caretaking function, Arizona courts have upheld: vehicle inventory searches, *State v. Gowans,* 109 Ariz. 521, 521–22, 514 P.2d 442, 442–43 (1973); *State v. Organ,* 225 Ariz. 43, 48–49, ¶¶ 20–26, 234 P.3d 611, 616–17 (App. 2010); the retrieval of a visible firearm from the cab of a truck parked in a busy, high-crime area, *Mendoza–Ruiz,* 225 Ariz. at 476, ¶ 12, 240 P.3d at 1238; and the stop of a vehicle with a defective taillight, *State v. Becerra,* 231 Ariz. 200, 203, ¶¶ 8–10, 291 P.3d 994, 997 (App.2013). We have also discussed the community-caretaking function when evaluating the search of a reportedly suicidal pedestrian's purse, though we concluded in

that case that community caretaking did not justify the search because the search was unreasonable. *Tiffany O.*, 217 Ariz. at 377–78, ¶¶ 26–32, 174 P.3d at 289–90.

¶ 20 The state asks us to extend *Cady* to warrantless intrusions into residences. We decline to do so. Unlike motor vehicles, residences are not so regularly subject to noncriminal police contact and there is no diminished expectation of privacy. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). We believe that if circumstances within a residence create a hazard to public health or safety, police may fulfill their obligation to protect the public by obtaining a warrant or, if the facts allow, by entering the residence under an applicable warrant exception.[1] As discussed above, "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal quotation marks omitted)). Here, despite the well-intentioned motives of the officers, there was simply no evidence that anyone was threatened with injury that could be mitigated by a warrantless entry into Defendant's residence. The record leaves us with no evidence that any circumstances rendered it impractical to wait until a warrant could be obtained before searching his residence. And to the extent that a warrant might have been difficult to justify because of the absence of evidence of a crime, we are loath to hold that warrantless entry into a residence is permissible based on facts that could not support a warrant.

---

1. This court recently upheld a warrantless entry into a residence under the rubric of the community-caretaking exception in *State v. Jacot*, 235 Ariz. 224, 228, ¶¶ 14–17, 330 P.3d 981, 985 (App. 2014). In *Jacot*, deputies approached a residence located in a remote area that had experienced a rash of burglaries. *Id.* at ¶ 16. They had been told the front door would be locked,

## CONCLUSION

¶ 21 The state failed to meet its burden to prove that the warrantless entry into Defendant's house was lawful, and the superior court erred by denying Defendant's motion to suppress. We reverse the order denying suppression, and remand to the superior court for further proceedings.

and instead found it wide open. *Id.* We agree with the decision in *Jacot*, because exigent circumstances justified the entry. Here, no such exigency existed and we conclude that the mere fact that the police were motivated by their community-caretaking responsibilities is not sufficient grounds for an exception to the warrant requirement as it pertains to residences.