7 P.3d 79

**STATE of Arizona, Appellee.**

v.

**Robert Allen POYSON, Appellant.**

No. CR–98–0510–AP.

Supreme Court of Arizona,
En Banc.

July 6, 2000.

Janet Napolitano, Attorney General By Paul J. McMurdie and J.D. Nielsen, Phoenix, for Appellee.

John W. Rood, III, Phoenix, for Appellant.

## O P I N I O N.

ZLAKET, Chief Justice.

¶1 A jury convicted defendant Robert Allen Poyson on three counts of first degree murder, one count of conspiracy to commit first degree murder, and one count of armed robbery. The trial court sentenced him to death for the murders, and to terms of imprisonment for the other offenses. Defendant appeals from his capital convictions and sentences.[1] We review this case pursuant to

---

1. Poyson also filed a notice of appeal from his robbery and conspiracy convictions but did not raise or brief any issues pertaining to them. We therefore affirm those convictions and sentences. *See State v. Van Adams,* 194 Ariz. 408, 411 n. 1, 984 P.2d 16, 19 n. 1 (1999), *cert. denied,* 528 U.S.

Art. 6, § 5(3) of the Arizona Constitution, A.R.S. § 13–4031, and Rule 31.2(b), Ariz. R.Crim. P. For the following reasons, we affirm.

### FACTS

¶ 2 Poyson met Leta Kagen, her fifteen year-old son, Robert Delahunt, and Roland Wear in April of 1996. The defendant was then nineteen years old and homeless. Kagen allowed him to stay with her and the others at their trailer in Golden Valley, near Kingman, Arizona. In August of the same year, Kagen was introduced to forty-eight year-old Frank Anderson and his fourteen year-old girlfriend, Kimberly Lane. They, too, needed a place to live, and Kagen invited them to stay at the trailer.

¶ 3 Anderson informed the defendant that he was eager to travel to Chicago, where he claimed to have organized crime connections. Because none of them had a way of getting to Chicago, Anderson, Poyson and Lane formulated a plan to kill Kagen, Delahunt, and Wear in order to steal the latter's truck.

¶ 4 On the evening of August 13, 1996, Lane lured Delahunt into a small travel trailer on the property, ostensibly for sex. There, Anderson commenced an attack on the boy by slitting his throat with a bread knife. Poyson heard Delahunt's screams and ran to the travel trailer. While Anderson held Delahunt down, the defendant bashed his head against the floor. He also beat the victim's head with his fists, and pounded it with a rock. This, however, did not kill Delahunt, so Poyson took the bread knife and drove it through his ear. Although the blade penetrated the victim's skull and exited through his nose, the wound was not fatal. Defendant thereafter continued to slam Delahunt's head against the floor until he lost consciousness. According to the medical examiner, Delahunt died of massive blunt force head trauma. In all, the attack lasted about 45 minutes. Remarkably, Kagen and Wear, who were in the main trailer with the radio on, never heard the commotion coming from the small trailer.

¶ 5 After cleaning themselves up, Poyson and Anderson prepared to kill Kagen and Wear. They first located Wear's .22 caliber rifle. Unable to find any ammunition, the defendant borrowed two rounds from a young girl who lived next door, telling her that Delahunt was in the desert surrounded by snakes and the bullets were needed to help rescue him. Defendant loaded the rifle and tested it for about five minutes to make sure it would function properly. He then stashed it near a shed. Later that evening, he cut the telephone line to the trailer so that neither of the remaining victims could call for help.

¶ 6 After Kagen and Wear were asleep, Poyson and Anderson went into their bedroom. Defendant first shot Kagen in the head, killing her instantly. After quickly reloading the rifle, he shot Wear in the mouth, shattering his upper right teeth. A struggle ensued, during which the defendant repeatedly clubbed Wear in the head with the rifle. The fracas eventually moved outside. At some point, Anderson threw a cinder block at Wear, hitting him in the back and knocking him to the ground. While the victim was lying there, the defendant twice kicked him in the head. He then picked up the cinder block and threw it several times at Wear's head. After Wear stopped moving, the defendant took his wallet and the keys to his truck. In order to conceal the body, the defendant covered it with debris from the yard. Poyson, Anderson, and Lane then took the truck and traveled to Illinois, where they were apprehended several days later.

### TRIAL ISSUES

#### Admission of Statements to Police

¶ 7 Poyson was arrested just after 10:00 p.m. on August 23, 1996, at an Evanston, Illinois homeless shelter. Over the next twenty-four hours, he was questioned three times at the Evanston police station and made incriminating statements. He now challenges the admission of those statements at trial, contending that they were involuntary, given without proper *Miranda* warn-

1172, 120 S.Ct. 1199, 145 L.Ed.2d 1102 (2000);

Ariz.R.Crim. P. 31.2(b).

ings, and recorded in violation of the Illinois eavesdropping statute.

¶ 8 Soon after he was brought into custody, the defendant was placed in an interview room and handcuffed to a beam mounted on the wall. He was then questioned by Sgt. Ralph Stegall of the Illinois State Police. After being advised of his *Miranda* rights, the defendant confessed to the murders of Delahunt, Kagen, and Wear. This first interview began at 10:40 p.m. and lasted just over two hours. Defendant was then left alone in the interview room for about an hour and a half. During this period, he was given a cigarette, a cold soda and a cheeseburger. He was also allowed to use the bathroom. Stegall then conducted a second interview, which began at 2:55 a.m. and ended at 3:25 a.m. Defendant was advised of his *Miranda* rights and again made incriminating statements. Afterward, he was taken back to his holding cell, where he slept for five or six hours.

¶ 9 The final interview began on the evening of August 24, 1996, at 8:38 p.m. and lasted about two hours. This time, the defendant was interviewed by Detective Eric Cooper of the Mohave County Sheriff's Office, who had flown to Illinois. Defendant was advised of his rights and then gave a detailed, tape-recorded account of his involvement in the murders. He drank a soda during the interview and smoked a cigarette during a five to ten minute break.

¶ 10 Poyson argues that these confessions were given under conditions so oppressive that his statements must be deemed involuntary. In Arizona, confessions are presumed to be involuntary, and the State has the burden of proving otherwise. *See State v. Scott,* 177 Ariz. 131, 136, 865 P.2d 792, 797 (1993). In ruling on voluntariness, a court must examine the totality of circumstances. See *id.; State v. Arnett,* 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978). Although "personal circumstances, such as intelligence and mental or emotional status, may be considered in a voluntariness inquiry, the critical element ... is whether police conduct constituted overreaching." *State v. Stanley,* 167 Ariz. 519, 524, 809 P.2d 944, 949 (1991); *see also Colorado v. Connelly,* 479

U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (holding that "coercive police activity is a necessary predicate" to an involuntariness finding); *Scott,* 177 Ariz. at 136, 865 P.2d at 797. A trial court's finding of voluntariness will be sustained absent clear and manifest error. *See Scott,* 177 Ariz. at 136, 865 P.2d at 797; *Arnett,* 119 Ariz. at 38, 579 P.2d at 546.

¶ 11 Defendant relies on his allegedly vulnerable mental state at the time of the statements. He emphasizes that he was depressed and remorseful when he made them. Defendant also cites his age (twenty at the time of the confessions), his "low average intelligence," and his fright at being interrogated by the police. He does not, however, point to any evidence in the record indicating that the officers exploited his remorse, his age, or his fear to gain a confession. In fact, we find no suggestion of police overreaching. The three interviews were not long, and occurred over a twenty-four hour period. One lasted only thirty minutes. The others were each about two hours in length. We find no indication that the questioning was particularly intense or marked by coercion. The officers scrupulously advised the defendant of his *Miranda* rights. Although handcuffed, he could comfortably sit or stand as he chose. *See United States v. Elie,* 111 F.3d 1135, 1144 (4th Cir.1997) (noting that handcuffing alone does not establish involuntariness). The officers never denied the defendant an opportunity to eat, drink, smoke, or use the bathroom. In fact, they made sure those needs were taken care of while he was in their custody.

¶ 12 Poyson makes much of the fact that the interviews took place at night and suggests that the police exploited his fatigue to extract a confession. We reject this contention. Sgt. Stegall testified that the defendant was alert and answered questions coherently. Defendant never asked for an opportunity to sleep nor did he otherwise indicate that he was too tired to continue the interviews. Nothing in the record establishes a sleep-deprived condition that the police should have recognized on their own. After the first two interviews with Stegall, the defendant was left undisturbed

in his cell for over fourteen hours. By his own account, he slept five or six of those hours. Nothing the police did prevented him from getting more sleep prior to the final interview that evening with Detective Cooper.

¶ 13   In short, the State proved that the defendant's statements were voluntary. *See, e.g., State v. Spears,* 184 Ariz. 277, 285–86, 908 P.2d 1062, 1070–71 (1996) (confession during a 4:00 a.m. interview held voluntary where defendant was in custody for sixteen hours without being offered food, drink or bedding, and without having used the bathroom); *Scott,* 177 Ariz. at 136–37, 865 P.2d at 797–98 (confession held voluntary where defendant went to police station at 2:00 a.m., was questioned for fourteen hours, and was given soft drinks and cigarettes upon request).

¶ 14   Defendant next argues that he did not receive proper *Miranda* warnings before the interview with Detective Cooper. The officer testified that he advised Poyson of his rights before he turned on the tape recorder. Although the warnings themselves were not recorded, the following exchange took place when the questioning began:

Cooper: [A] couple of minutes ago, Bobby, I advised you of your *Miranda* rights, is that correct?

Poyson: Yes, you did.

Cooper: And did I do it from memory or did I read 'em?

Poyson: You read 'em and from memory.

Cooper: Okay. And did you understand those rights?

Poyson: Yes, I did.

Cooper: Okay, Do you re—can you just repeat 'em back to me?

Poyson: I HAVE THE RIGHT TO REMAIN SILENT. AND ANYTHING I SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW. I HAVE THE RIGHT TO AN ATTORNEY. IF I CANNOT AFFORD ONE, ONE WILL, ONE WILL [sic] BE APPOINTED TO ME.

Cooper: Okay. And did you understand all that?

Poyson: Yes, I did.

[Capitals in original]. Defendant argues that because he did not say the words, "I have the right to an attorney present *during questioning*" when repeating what he had been told, there is evidence that Cooper never specifically advised him of that right. Thus, he asserts, the *Miranda* warnings were defective. After hearing testimony at the suppression hearing, the trial court found that the officer properly advised Poyson and concluded that the defendant simply "paraphras[ed] his rights in a manner less sophisticated than might be done by a lawyer or a police officer."

■   ¶ 15   The trial court's ruling on a motion to suppress will be upheld absent clear and manifest error. *See State v. Spreitz,* 190 Ariz. 129, 144, 945 P.2d 1260, 1274 (1997); *Stanley,* 167 Ariz. at 523, 809 P.2d at 948. Here, the court's finding was not clearly erroneous. Cooper testified that he read Poyson his rights, and the defendant has never explicitly denied that fact. When questioned at the suppression hearing, Poyson said that he could not recall whether he was so advised; however, he conceded on cross-examination that it was possible the officer may have done so. On re-direct, the defendant repeated this testimony. Perhaps the best evidence on this subject is the statement itself, in which the defendant admits that Cooper read him his rights both from a card and from memory. This admission was made only minutes after the warnings were read, when the defendant's recollection was fresh. Based on such evidence, the trial court could reasonably find that Poyson was fully advised, even though he was not able to recite the *Miranda* litany verbatim.

■   ¶ 16   Finally, the defendant contends that the interview with Cooper was taped in violation of the Illinois eavesdropping statute and should have been suppressed. Illinois law makes it a crime to record a conversation without the permission of the parties. *See* 720 Ill. Comp. Stat. Ann. 5/14–1 to 5/14–5 (West 1993 & Supp.1999). Statements obtained in violation of the statute are inadmis-

sible in both civil and criminal cases. *See id.* 5/14–5.

¶ 17  The trial court found that Cooper obtained permission prior to questioning, although the only recorded request for permission occurs about a third of the way through the interview. Cooper said that he asked for, and received, consent to tape the interview before it began. Sgt. Stegall testified that he did not specifically recall whether Cooper requested permission to record the interview. Nevertheless, he said that he would not have participated in the interview unless Cooper had secured permission. Defendant denied that Cooper ever sought his consent to record their discussion. It is clear that the trial judge regarded Cooper and Stegall as the more credible witnesses. We cannot say that his resolution of this factual conflict was clearly erroneous.

**Admission of the Palm Print**

¶ 18  Defendant argues that the trial court erred in denying his motion to preclude evidence of a palm print found in the small travel trailer where Robert Delahunt was murdered.

¶ 19  On February 4, 1998, the court ordered both the prosecution and defense to "disclose to the other side any names of witnesses, addresses of witnesses, [and] statements or reports that have been written by such witnesses" no later than two weeks before the trial date of March 2, 1998. On February 25, defense counsel interviewed Glenda Hardy, a print examiner for the Arizona Department of Public Safety. During the interview, Ms. Hardy referred to a "bloody palm print" that was taken from a shelf in the travel trailer where Delahunt was killed, which she identified as belonging to the defendant.

¶ 20  Defendant asked the trial court to exclude the palm print because the State had violated the discovery deadline. He asserted that Hardy's previous reports had referred only to "latent" prints (which he understood to mean "invisible") and had never mentioned a "bloody palm print." The late disclosure was unduly prejudicial, he argued, because "[u]p to that point, there was no physical

evidence linking Robert Poyson to those homicides." The court denied the motion on the ground that previous reports had disclosed the existence of "latent prints." "Perhaps [the State] didn't refer to [the palm print] with as much specificity as they could have," the court said, "but I think the State has complied with the discovery requirements." For the same reason, the court also denied the defendant's motion to continue in order to have an expert analyze the palm print.

¶ 21  A trial court's erroneous decision to admit evidence not timely disclosed by the prosecution may, under some circumstances, be deemed harmless. *See State v. Krone,* 182 Ariz. 319, 321, 897 P.2d 621, 623 (1995). Error is harmless if the reviewing court can say, beyond a reasonable doubt, that it did not contribute to or affect the verdict. *See State v. Fulminante,* 193 Ariz. 485, 500, 975 P.2d 75, 90 (1999); *Krone,* 182 Ariz. at 321, 897 P.2d at 623; *State v. McVay,* 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980). This is a fact-specific inquiry; there is no bright-line method of determining whether a particular error is harmless. *See State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).

¶ 22  Assuming, *arguendo,* that the trial court should not have admitted the palm print, we nevertheless conclude that the error was harmless. During his interview with Detective Cooper, Poyson gave a tape-recorded statement in which he admitted his involvement in these murders. The jury heard the tape at trial. Along with this voluntary confession, the State presented physical evidence from the scene and testimony by the medical examiner, all of which confirmed that the murders occurred exactly as the defendant said they had. Given the weight of this evidence, a jury would almost certainly have returned a guilty verdict even without the palm print. Any error in admitting it or in denying the motion for a continuance was harmless beyond a reasonable doubt. *See, e.g., State v. Sharp,* 193 Ariz. 414, 420, 973 P.2d 1171, 1177, *cert. denied,* 528 U.S. 936, 120 S.Ct. 341, 145 L.Ed.2d 266 (1999) (admission of victim's broken and bloodied eyeglasses, which were found hid-

den under defendant's mattress, was harmless error in light of overwhelming evidence against defendant); *State v. Spreitz,* 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997)(erroneous admission of gruesome autopsy photos was harmless due to the overwhelming evidence of defendant's guilt, "including, most importantly, his own uncoerced confession"); *Bible,* 175 Ariz. at 588, 858 P.2d at 1191 (erroneous admission of DNA evidence was harmless where other evidence unequivocally pointed to defendant's guilt).

## SENTENCING ISSUES

### AGGRAVATION

¶ 23   The trial court found that the State proved the following three aggravating factors beyond a reasonable doubt: that each of these murders was committed in expectation of pecuniary gain, *see* A.R.S. § 13–703(F)(5); that the murders of Delahunt and Wear were especially cruel, *see id.* § 13–703(F)(6); and that the defendant was convicted of multiple homicides committed during the same offense. *See id.* § 13–703(F)(8). Defendant does not challenge these findings. Nevertheless, we must independently review the aggravating circumstances identified by the trial court. *See* A.R.S. § 13–703.01(A); *State v. Tankersley,* 191 Ariz. 359, 371, 956 P.2d 486, 498 (1998).

### Pecuniary Gain

¶ 24   For the pecuniary gain factor to apply, the State must prove beyond a reasonable doubt that receiving something of value was a "motive, cause or impetus [for the murder] and not merely the result." *State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993). In this case, the record is replete with evidence that the defendant and Anderson committed the murders in order to steal Roland Wear's truck. As soon as Anderson arrived in Golden Valley, he told the defendant that he was eager to leave. Two days later, the pair agreed to kill Delahunt, Wear and Kagen so that they could steal the truck and drive to Chicago. As Poyson admitted in his confession, this was the motive for the killings. This evidence is sufficient to support the pecuniary gain aggravator. *See State v. Trostle,* 191 Ariz. 4,

17–18, 951 P.2d 869, 882–83 (1997) (upholding (F)(5) finding where the defendant's motivation for the murder was to facilitate stealing a truck).

### Especially Cruel, Heinous or Depraved

¶ 25   A murder is especially cruel if the victim consciously suffers physical pain or mental anguish before death. *See, e.g., State v. Bolton,* 182 Ariz. 290, 311, 896 P.2d 830, 851 (1995); *State v. Medrano,* 173 Ariz. 393, 397, 844 P.2d 560, 564 (1992). "Mental anguish can result when the victim experiences significant uncertainty about his or her ultimate fate." *State v. Schackart,* 190 Ariz. 238, 248, 947 P.2d 315, 325 (1997); *see also State v. Medina,* 193 Ariz. 504, 513, 975 P.2d 94, 103 (1999). Here, the State proved beyond a reasonable doubt that Delahunt and Wear engaged in protracted struggles for their lives, during which they undoubtedly experienced extreme mental anguish and physical pain.

¶ 26   The existence of mental distress is apparent from the length of time during which both victims fought off the attacks of the defendant and Frank Anderson, as well as the victims' statements during the attacks. After Delahunt's throat was slashed, he struggled with Anderson and the defendant for some forty-five minutes before dying. He had two defensive wounds on his left hand, confirming that he was conscious throughout the ordeal. *See Medrano,* 173 Ariz. at 397, 844 P.2d at 564; *State v. Amaya-Ruiz,* 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990). According to the defendant's confession, Delahunt repeatedly asked why he and Anderson were trying to kill him. Likewise, after being shot in the mouth, Wear fought with Poyson and Anderson for several minutes before he died. During the attack, Wear begged the defendant not to hurt him, saying "Bobby, stop. Bobby don't. I never did anything to hurt you." In our view, it is beyond dispute that these victims suffered unspeakable mental anguish. *See Medina,* 193 Ariz. at 513, 975 P.2d at 103 (concluding that victim's cries of "Please don't hit me. Don't hit me. Don't. Don't," evidenced both physical and mental pain and suffering); *State v. Rienhardt,* 190 Ariz. 579,

590, 951 P.2d 454, 455 (1997) (upholding cruelty finding where victim experienced twenty minute ride to the desert after being told he would be killed, and made statements revealing that he feared for his life).

¶ 27 Clearly, the victims also suffered severe physical pain. Delahunt's throat was slashed by Anderson. Defendant then slammed the victim's head against the floor and pounded it with a rock. Later, he drove a knife into Delahunt's ear while the boy was still conscious and struggling. Similarly, Wear suffered a gunshot wound to the mouth that shattered several of his teeth. He was then struck in the head numerous times with a rifle. Like Delahunt, he was conscious during much of the attack. Thus, the State proved beyond a reasonable doubt that the victims suffered great physical pain before their deaths. *See State v. Apelt (Michael),* 176 Ariz. 349, 367, 861 P.2d 634, 652 (1993) (affirming cruelty finding where victim was conscious when struck repeatedly with great force, stabbed in the back and chest, and her throat was slashed); *State v. Brewer,* 170 Ariz. 486, 501, 826 P.2d 783, 799 (1992) (upholding cruelty finding where victim was conscious during forty-five minute attack).

## Multiple Homicides

¶ 28 The murders occurred over a relatively short period of time (about five hours), at the same residence, and were a part of a single course of conduct. *See State v. Djerf,* 191 Ariz. 583, 597, 959 P.2d 1274, 1288 (1998) (upholding (F)(8) finding where all four murders were committed in the same house during a period of about five hours). Thus, Poyson was convicted of one or more other homicides committed during the course of each victim's murder. *See* A.R.S. § 13–703(F)(8). This aggravating factor was proven beyond a reasonable doubt.

## MITIGATION

¶ 29 The trial court found that the defendant did not prove any of the statutory mitigating factors set out in A.R.S. § 13–703(G)(1)–(5). Defendant challenges the court's (G)(1) and (G)(5) findings. We independently review the mitigating circumstances. *See* A.R.S. § 13–703.01(A).

## Drug Use

¶ 30 The trial court rejected Poyson's claim that drugs significantly impaired his ability to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. *See* A.R.S. § 13–703(G)(1). It reasoned that because the defendant was able to carry out the plan to murder Kagen, Wear, and Delahunt, it is unlikely that he was impaired by drugs. Defendant, on the other hand, argues that his drug use in the days leading up to, and on the day of, the murders caused significant impairment.

¶ 31 A.R.S. § 13–703(G)(1) is phrased disjunctively. *See State v. Rossi,* 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987). Thus, the defendant can show either that he was unable to conform his conduct to the requirements of the law, or that he could not appreciate the wrongfulness of his conduct; he is not required to prove both. *See id.* In this case, we hold that the defendant has failed to prove either prong of the statute.

¶ 32 We cannot say that the defendant's drug use rendered him unable to conform his conduct to the requirements of the law. First of all, there is scant evidence that he was actually intoxicated on the day of the murders. Although Poyson purportedly used both marijuana and PCP "on an as available basis" in days preceding these crimes, the only substance he apparently used on the date in question was marijuana. However, the defendant reported smoking the marijuana at least six hours before killing Delahunt and eleven hours before the murders of Kagen and Wear. Thus, even if he was still "high" at the time of these crimes, it is unlikely that he was so intoxicated as to be unable to conform his conduct to the requirements of the law. In order to constitute (G)(1) mitigation, the defendant must prove substantial impairment from drugs or alcohol, not merely that he was " 'buzzed.' " *State v. Schackart,* 190 Ariz. 238, 251, 947 P.2d 315, 328 (1997).

¶ 33 Defendant also claims to have had a PCP "flashback" during the murder of Delahunt. The trial court did not find the evi-

dence credible on this point. We agree. Other than the defendant's self-reporting, nothing in the record supports this claim, nor is there evidence that any such "flashback" had an effect on his ability to control himself. Even taking the evidence at face value, the episode appears to have lasted only a few moments during Delahunt's murder. The defendant was apparently not under the influence of PCP at any other time. Thus, the flashback could not have affected his decision to begin the attack or to continue it once the flashback subsided; nor could it have played a role in his decision to kill Kagen and Wear later that night. We are therefore not convinced that Poyson's ability to control his conduct was significantly affected by PCP use.

¶ 34   Other evidence in the record belies the defendant's claim of impairment. For instance, he was able to concoct a ruse to obtain bullets from the neighbor. He also had the foresight to test the rifle, making sure it would work properly when needed, and to cut the telephone line to prevent Kagen and Wear from calling for help. These actions, coupled with the deliberateness with which the murders were carried out, lead us to conclude that the defendant was not suffering from any substantial impairment on the day in question. *See State v. Tittle*, 147 Ariz. 339, 343–44, 710 P.2d 449, 453–54 (1985) (detailed plan to commit murder was inconsistent with claim of impairment).

¶ 35   Poyson's attempts to conceal his crimes also indicate that he was able to appreciate the wrongfulness of his actions. For example, he had Kimberly Lane sneak him into the main trailer after murdering Delahunt so that he could wash the blood from his hands. He also covered Wear's body with debris in order to delay its discovery by police after he and the others had fled. These actions show that he "understood the wrongfulness of his acts and attempted to avoid prosecution." *State v. Jones*, 185 Ariz. 471, 489, 917 P.2d 200, 218 (1996) ((G)(1) not satisfied where defendant took significant steps to conceal his crimes and evade capture); *see also State v. Sharp*, 193 Ariz. 414, 424, 973 P.2d 1171, 1181, *cert.*

*denied*, 528 U.S. 936, 120 S.Ct. 341, 145 L.Ed.2d 266 (1999) ((G)(1) not proven where defendant attempted to hide evidence that might link him to the crime). We also note that the defendant was able to recall in remarkable detail how he committed these murders. We have found this to be a significant fact in rejecting a perpetrator's claim that he could not appreciate the wrongfulness of his actions. *See, e.g., State v. Gallegos*, 185 Ariz. 340, 345, 916 P.2d 1056, 1061 (1996); *Rossi*, 154 Ariz. at 251, 741 P.2d at 1229; *State v. Wallace*, 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986). We hold, therefore, that the defendant failed to prove the (G)(1) mitigating circumstance.

### Age

¶ 36   Although Poyson was only nineteen at the time of the murders, the trial court ruled that his age was not a statutory mitigating factor under A.R.S. § 13–703(G)(5). The judge acknowledged that he was "relatively young, chronologically speaking," but said that he was not so young, "[a]s far as the criminal justice system goes." The court cited the fact that the defendant had lived on his own for some time before the crimes and had been working. Defendant argues that because of his age and immaturity, he was easily influenced by others, including his co-defendants in this case.

¶ 37   "The age of the defendant at the time of the murder can be a substantial and relevant mitigating circumstance." *State v. Laird*, 186 Ariz. 203, 209, 920 P.2d 769, 775 (1996). We have found the (G)(5) factor to exist in cases where defendants were as old as nineteen and twenty. *See State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997) (twenty); *State v. Bolton*, 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995) (nineteen); *State v. Herrera, Jr.*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993) (twenty); *State v. Greenway*, 170 Ariz. 155, 170, 823 P.2d 22, 37 (1991) (nineteen). Chronological age, however, is not the end of the inquiry. To determine how much weight to assign the defendant's age, we must also consider his level of intelligence, maturity, past experience, and level of participation in the killings. *See Trostle*, 191 Ariz. at 21, 951 P.2d at 886;

*Laird,* 186 Ariz. at 209, 920 P.2d at 775. If a defendant has a substantial criminal history or was a major participant in the commission of the murder, the weight his or her age will be given may be discounted. *See, e.g., State v. Gallegos,* 185 Ariz. 340, 346, 916 P.2d 1056, 1062 (1996); *Bolton,* 182 Ariz. at 314, 896 P.2d at 854; *Greenway,* 170 Ariz. at 170, 823 P.2d at 37.

¶ 38 At his sentencing hearing, Poyson presented evidence that he was of "low average" intelligence. We agree with the trial court that this fact was shown by a preponderance of the evidence. Defendant also presented some evidence that he was immature and easily led by others. One of his cousins, for example, believed that because he lacked a consistent father figure growing up, he was prone to be influenced by older men like Frank Anderson. Arguably, these facts weigh in favor of assigning some mitigating weight to the defendant's age. However, he was no stranger to the criminal justice system. As a juvenile, he had committed several serious offenses, including burglary and assault, for which he served time in a detention facility. Moreover, it is clear that he was a major participant in these murders at both the planning and execution stages.

¶ 39 We conclude that Poyson's age is a mitigating circumstance. However, in light of his criminal history and his extensive participation in these crimes, we accord this factor little weight. *See Jackson,* 186 Ariz. at 31–32, 918 P.2d at 1049–50 (discounting defendant's age based on his high level of participation in the murder); *Gallegos,* 185 Ariz. at 346, 916 P.2d at 1062 (same); *Bolton,* 182 Ariz. at 314, 896 P.2d at 854 (same).

## INDEPENDENT REWEIGHING

■ ¶ 40 A.R.S. § 13–703.01(A) requires us to independently review and reweigh the aggravating and mitigating circumstances in every capital case in order to determine the propriety of the death sentence. *See, e.g., State v. Medina,* 193 Ariz. 504, 516, 975 P.2d 94, 106 (1999). As noted above, the trial court found, as to victims Wear and Delahunt, that the State had proven three statutory aggravators: A.R.S.

§§ 13–703(F)(5), murder committed for pecuniary gain; (F)(6), murder committed in an especially cruel manner; and (F)(8), multiple homicides. As to the victim Kagen, the court concluded that the State had proven two aggravators: (F)(5) and (F)(8). The trial court also held that the defendant had failed to prove any statutory mitigators. We agree with the court's findings regarding the aggravating factors. However, as indicated above, we believe the defendant's age is a mitigating circumstance that should be given some weight, albeit minimal.

¶ 41 Poyson also presented evidence regarding several nonstatutory mitigating factors but the trial judge found that he had proven only one by a preponderance of the evidence: cooperation with law enforcement. As to the others, the court concluded that either (1) the mitigator had not been proven, or (2) the mitigator had been proven but was not entitled to any weight. Defendant challenges several of these rulings. We briefly summarize the court's findings and the evidence presented at the sentencing hearing.

### Drug Use

¶ 42 The trial judge refused to accord any weight to the defendant's substance abuse as a nonstatutory mitigating circumstance. It characterized the defendant's claims that he had used drugs or alcohol in the past or was under the influence of drugs on the day of the murders as little more than "vague allegations." As discussed above, we agree.

### Mental Health

■ ¶ 43 The trial court found that Poyson suffers from "certain personality disorders" but did not assign any weight to this factor. Dr. Celia Drake diagnosed the defendant with antisocial personality disorder, which she attributed to the "chaotic environment in which he was raised." She found that there was, among other things, no "appropriate model for moral reasoning within the family setting" to which the defendant could look for guidance. However, we find no indication in the record that "the disorder controlled [his] conduct or impaired his men-

82

tal capacity to such a degree that leniency is required." *State v. Brewer*, 170 Ariz. 486, 505, 826 P.2d 783, 802 (1992); *see also Medina*, 193 Ariz. at 517, 975 P.2d at 107 (holding that the defendant's personality disorder "ha[d] little or no mitigating value" where the defendant's desire to emulate his friends, not his mental disorder, was the cause of his criminal behavior). We therefore accord this factor no mitigating weight.

## Abusive Childhood

¶44 The trial court found that the defendant failed to prove a dysfunctional family background or that he suffered physical or sexual abuse as a child. Defendant presented some evidence that as a youngster he was physically and mentally abused by several stepfathers and his maternal grandmother. He also self-reported one instance of sexual assault by a neighbor. Again, however, defendant did not show that his traumatic childhood somehow rendered him unable to control his conduct. Thus, the evidence is without mitigating value.

## Remorse

¶45 The trial court found that the defendant was remorseful about the commission of the offenses but gave that circumstance no weight. The court thought that if he were truly remorseful, he would have prevented one or two of the killings or would have turned himself in. Defendant presented some evidence of remorse. Sgt. Stegall testified that during questioning Poyson expressed remorse, particularly about the murder of Delahunt. In his statement to Detective Cooper, the defendant said that he felt "bad" about all of the murders. We find this evidence unpersuasive and, like the trial judge, accord it no real significance.

## Potential for Rehabilitation

¶46 The trial court ruled that the defendant failed to prove that he could be rehabilitated. The judge said that "[i]f there is anything that has been presented to even suggest that, I must have missed it." Dr. Drake's report suggests that the defendant is rehabilitatable, based on his past history of success in other institutional settings. She

said that "[t]here are some indications that he ... was responsive to the structure provided in various placements. In discharge summaries from all three institutions in which he was placed there was documented progress." We find that this evidence has some mitigating value. *See State v. Murray*, 184 Ariz. 9, 40, 906 P.2d 542, 573 (1995) (potential for rehabilitation can be a mitigating circumstance).

## Family Support

¶47 The trial court found that the defendant failed to establish any meaningful family support. At the mitigation hearing, the defendant's mother and aunt testified. Other relatives cooperated with Mr. Abbott, the defense mitigation specialist, during his investigation, and several family members wrote letters asking the court to spare Poyson's life. We accord this factor minimal mitigating weight. *See State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995) (family support can be given de minimis weight in mitigation).

¶48 After our independent review, we conclude that even crediting defendant's cooperation with law enforcement, age, potential for rehabilitation, and family support, the mitigating evidence in this case is not sufficiently substantial to call for leniency.

## ISSUES RAISED TO AVOID PRECLUSION

¶49 Defendant seeks to preserve numerous constitutional challenges to Arizona's death penalty scheme. We have dispositively addressed these issues in previous cases as follows:

¶50 Prosecutor has unfettered discretion to seek the death penalty, rejected in *State v. Sharp*, 193 Ariz. 414, 426, 973 P.2d 1171, 1183, *cert. denied*, 528 U.S. 936, 120 S.Ct. 341, 145 L.Ed.2d 266 (1999).

¶51 Pecuniary gain aggravating factor does not sufficiently narrow the class of death eligible individuals, rejected in *State v. West*, 176 Ariz. 432, 448–49, 862 P.2d 192, 208–09 (1993).

 

¶ 52 Judge alone makes aggravation or mitigation findings, rejected in *State v. Schackart,* 190 Ariz. 238, 260, 947 P.2d 315, 337 (1997).

¶ 53 The death penalty discriminates against young, poor and male defendants, rejected in *Schackart,* 190 Ariz. at 260, 947 P.2d at 337.

¶ 54 Capital punishment is unconstitutional on its face and as applied, rejected in *State v. White,* 194 Ariz. 344, 355, 982 P.2d 819, 830 (1999), *cert. denied* 529 U.S. 1005, 120 S.Ct. 1272, 146 L.Ed.2d 221 (2000) (not unconstitutional on its face); *State v. Van Adams,* 194 Ariz. 408, 422, 984 P.2d 16, 30 (1999), *cert. denied,* 528 U.S. 1172, 120 S.Ct. 1199, 145 L.Ed.2d 1102 (2000) (not per se cruel and unusual punishment); *Schackart,* 190 Ariz. at 260, 947 P.2d at 337 (not imposed arbitrarily and irrationally).

¶ 55 No opportunity to death-qualify the sentencing judge, rejected in *Schackart,* 190 Ariz. at 260, 947 P.2d at 337.

¶ 56 A.R.S. § 13–703(F)(6) violates the Equal Protection Clause, rejected in *State v. Gallegos,* 185 Ariz. 340, 348, 916 P.2d 1056, 1064 (1996).

¶ 57 No statutory standards for weighing, rejected in *Schackart,* 190 Ariz. at 260, 947 P.2d at 337.

¶ 58 No proportionality review, rejected in *Schackart,* 190 Ariz. at 260, 947 P.2d at 337.

¶ 59 Statute does not require sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, rejected in *White,* 194 Ariz. at 355, 982 P.2d at 830.

### DISPOSITION

¶ 60 For the foregoing reasons, we affirm the defendant's convictions and sentences.

CONCURRING: CHARLES E. JONES, Vice Chief Justice, STANLEY G.

FELDMAN, Justice, FREDERICK J. MARTONE, Justice and RUTH V. McGREGOR, Justice.