SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-01-0272-AP |
| Appellee, | ) | |
| | ) | Yuma County Superior |
| v. | ) | Court |
| | ) | Nos. S1400CR198311801 |
| BERNARD SMITH, | ) | and  S1400CR198311817 |
| | ) | |
| Appellant.) | | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court of Yuma County
The Honorable John N. Nelson
Nos. S1400CR198311801 and S1400CR198311817
APPROVED IN PART

_____

John W. Rood, III                                          Phoenix
Attorney for Bernard Smith

Janet Napolitano, Attorney General                         Phoenix
By   Kent Cattani, Chief Counsel
     Capital Litigation Section
and  J.D. Nielsen, Assistant Attorney General
Attorneys for the State of Arizona

_____

M c G R E G O R, Vice Chief Justice

**I.**

¶1      Shortly before midnight on August 21, 1983, appellant Bernard Smith backed his car into a parking space and entered the Low Cost Market in Yuma.  At the counter, he requested a pack of Player cigarettes and paid for them with a five dollar bill.  Once cashier Charles Pray opened the cash register, Smith pulled back the hammer of the .22 caliber, single-action revolver he carried so that it would make a clicking sound and told Pray, "Give me all of the money or I will blow your fucking head off."  Pray did not

immediately comply with Smith's demand; instead he twice called out the name of the market's manager. Smith then discharged the gun, shooting Pray in the neck. Smith went around the counter to remove the currency from the cash register and left the store.

¶2 Approximately fifteen minutes later, a Yuma County Sheriff's Deputy stopped Smith's vehicle, and an officer of the Yuma Police Department took Smith into custody. In Smith's car, the police found blood-stained currency and a .22 caliber pistol.

¶3 The State charged Smith with armed robbery. Nearly two weeks later Charles Pray died from his wounds, and the Grand Jury issued an additional indictment charging Smith with first degree murder. While Smith was in custody for the incident at the Low Cost Market, the State also charged him with armed robberies of three Yuma Circle K stores occurring on July 23, August 14, and August 15, 1983. Prior to his trial for the Low Cost Market robbery and Pray's murder, a jury convicted Smith of the Circle K robberies, and the court sentenced him to three life sentences.

¶4 At his trial for the Low Cost Market incident, Smith maintained his innocence and blamed the robbery and shooting on one Al Johnson, who was never located. The jury did not believe Smith's defense and convicted him of both robbery and first degree murder. The trial judge sentenced Smith to death. On direct appeal, we affirmed Smith's conviction and sentence. *State v. Smith*, 146 Ariz. 491, 707 P.2d 289 (1985).

2

¶5        In 1998, on appeal of the district court's denial of Smith's petition for habeas corpus, the Ninth Circuit Court of Appeals held that he did not receive effective assistance of counsel during the sentencing phase of his trial because his attorney failed to develop and present "any mitigation evidence at all for the purpose of defending Smith against the death penalty." *Smith v. Stewart,* 140 F.3d 1263, 1269 (9th Cir. 1998).  The court remanded the case to the district court "with directions that it issue a writ releasing Smith from the sentence of death and directing that he be resentenced."  *Id.* at 1274.

¶6        In April 2001, Judge John N. Nelson of the Yuma County Superior Court held a sentencing hearing at which he found that the State proved three aggravating circumstances:  previous convictions for which under Arizona law a life sentence could be imposed; prior convictions involving the use or threat of violence; and pecuniary gain.  Arizona Revised Statutes (A.R.S.) §§ 13-703.F.1, 5 (2001), 13-703.F.2 (1992).[1]  In addition, the judge found that Smith did not prove any statutory mitigating factors and that the non-statutory mitigating circumstance he proved did not weigh heavily enough to call for leniency.  On May 31, 2001, the court again

---

[1]    The legislature recently amended Ariz. Rev. Stat. (A.R.S.) § 13-703, so that the aggravating factors are now found in subsection G and the mitigating factors in subsection H.  *See* A.R.S. § 13-703 (Supp. 2001).  When the court resentenced Smith this change had not yet taken effect.

3

sentenced Smith to death.

¶7    Appeal to this court is automatic and direct when the court imposes a sentence of death.  A.R.S. § 13-703.01.A (2001); Ariz. R. Crim P. 31.2.b.  We exercise jurisdiction pursuant to Article VI, Section 5.3 of the Arizona Constitution, A.R.S. section 13-4031, and Arizona Rule of Criminal Procedure 31.2.b.

## II.

¶8    Prior to the sentencing hearing, Judge Nelson informed the parties that the victim's son and daughter-in-law, Terry and Jane Pray, were longtime employees of the Yuma County Superior Court and that he had some professional contact with them in the past.  Terry Pray had worked as a juvenile probation officer since 1977.  Mr. Pray did not work in the superior court building and had no professional contact with Judge Nelson after he became a sitting judge in 1998, but the two occasionally crossed paths in the court building.  In 1974 or 1975, Jane Pray worked as a secretary in the county attorney's office for a few months while Judge Nelson was a deputy county attorney.  Beginning in 1975, she served as a judicial assistant to superior court Judges Keddie and Hall.  In September 1999, Ms. Pray became the superior court's case flow manager.  In that capacity, she occasionally attended meetings with the judges and also dealt with them on criminal case flow issues. Ms. Pray rarely dealt directly with Judge Nelson, who was assigned to a civil calendar; when her job required contact with his

4

chambers, she usually spoke with his judicial assistant. In addition, Ms. Pray's office is situated on the floor above Judge Nelson's, and they have little casual contact in the building.

¶9 After Judge Nelson revealed his acquaintance with the Prays at a status hearing on January 24, 2000, defense counsel indicated that he would file a motion for change of venue. Judge Nelson transferred the case to the Yuma County presiding judge, who then transferred the case to the presiding judge in Pinal County to set a hearing on the motion for change of venue. On April 21, 2000, Pinal County Judge Boyd T. Johnson conducted a hearing on the motion.

¶10 Smith asserted that his motion was a "hybrid" between a Rule 10.3 motion for change of venue and a Rule 10.1 motion for change of judge and that, although the written motion referred only to Judge Nelson, its aim was to disqualify all the Yuma County Superior Court judges. *See* Ariz. R. Crim. P. 10.1, 10.3. The State argued that the motion could not be treated as a Rule 10.3 motion because that rule refers only to trials and specifically excludes motions based on "the interest or prejudice of the trial judge." Ariz. R. Crim. P. 10.3.a. The State further argued that if the motion were treated as one under Rule 10.1, it was barred as untimely. *See* Ariz. R. Crim. P. 10.1.b. Judge Johnson concluded that the motion should be treated as a Rule 10.1 motion and that it was not timely filed. We review Judge Johnson's ruling on the

5

motion for abuse of discretion.  *State v. Schackart*, 190 Ariz. 238, 257, 947 P.2d 315, 334 (1997).

¶11    We first consider whether Smith waived any objection to Judge Nelson acting as the sentencing judge.  We agree with Judge Johnson that Smith's hybrid motion was properly treated as a motion for change of judge for cause.  A motion for change of judge must be filed within ten days after discovery that grounds for a change of judge exist.  Ariz. R. Crim. P. 10.1.b.  When Judge Nelson disclosed his professional relationship with the Prays, Smith's attorney had already planned to file a motion for change of venue based on the Prays' employment by the court.  In fact, the record indicates that Smith knew of the professional relationship at least six months prior to Judge Nelson's disclosure.  Therefore, Smith failed to timely file his Rule 10.1 motion.

¶12    Smith now argues that he based his motion on an ethical conflict, to which objection cannot be waived.  *See State v. Valencia*, 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979).  At the hearing, however, Smith expressly disclaimed any reliance on the Code of Judicial Conduct as a basis for Judge Nelson's recusal.  He then argued only that Canon 2, which directs judges to avoid the appearance of impropriety, provided the context in which Judge Johnson should decide the motion.  *See* Ariz. R. Sup. Ct. 81, Canon 2.  Smith did not argue that Canon 3.E, which mandates a judge disqualify himself when his impartiality may reasonably be

6

questioned, provided a basis for Judge Nelson's disqualification. *See* Ariz. R. Sup. Ct. 81, Canon 3.E. We further note that, although nearly a year passed between Judge Johnson's order denying Smith's motion and the sentencing hearing before Judge Nelson, Smith never availed himself of the opportunity to bring a special action to challenge Judge Johnson's decision. Although Smith arguably waived the arguments on which he now relies, we exercise our discretion and address the merits of the motion.

¶13 Rule 10.1 provides that "any defendant shall be entitled to a change of judge if a fair and impartial hearing . . . cannot be had by reason of the interest or prejudice of the assigned judge." Ariz. R. Crim. P. 10.1.a. Judges are presumed to be impartial, and the party moving for change of judge must prove a judge's bias or prejudice by a preponderance of the evidence. *State v. Carver*, 160 Ariz. 167, 172, 771 P.2d 1382, 1387 (1989). Smith never alleged, and in fact disavowed, that Judge Nelson held any actual bias, and nothing presented at the hearing shows any bias. Therefore, Smith did not meet his burden of proof under Rule 10.1.

¶14 Having expressly avoided relying on the Code of Judicial Conduct as a basis for Judge Nelson's disqualification at the hearing, Smith now argues that the appearance of impropriety created by the Prays' professional contacts with Judge Nelson required his recusal. *See* Ariz. R. Sup. Ct. 81, Canon 2. Although

7

Smith does not rely upon it, Canon 3.E, which states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," also arguably applies to his present contention. Ariz. R. Sup. Ct. 81, Canon 3.E(1).

¶15    Canon 3.E lists several instances in which a judge must disqualify himself or herself.[2]  Judge Nelson's relationship with the Prays does not fit into any of the situations delineated in Canon 3.E for which disqualification is required.  The closest analog involves those instances in which "the judge has a personal bias or prejudice concerning a party." Ariz. R. Sup. Ct. 81, Canon 3.E(1)(a).  However, because Smith made no allegation or showing that Judge Nelson had any bias, Canon 3.E did not expressly require Judge Nelson's disqualification.

¶16    If a situation is not one of those outlined in Canon 3.E, but nonetheless implicates impartiality, a judge should consider "[w]hether an objective, disinterested observer fully informed of the facts underlying the grounds on which . . . disqualification [was] contemplated would entertain a significant doubt that justice

---

    [2]    Canon 3.E(1) contains a non-exclusive list of situations that call for a judge's disqualification, including instances in which (1) a judge has a personal bias or knowledge of disputed facts in a proceeding, (2) a judge previously served as an attorney or is a material witness in the proceeding, (3) a judge has a financial interest in the proceeding, or (4) a judge has a family relationship with someone involved in the proceeding.  Ariz. R. Sup. Ct. 81, Canon 3.E(1)(a)-(d).

8

would be done in the case." Ariz. Jud. Ethics Adv. Comm. Op. 96-14 at 1 (1996). We find it significant that not even Smith, who scarcely qualifies as an objective, disinterested observer, entertained any doubt as to Judge Nelson's freedom from bias or prejudice, and thus could not have entertained any significant doubt that Judge Nelson would do justice in this matter. We conclude that Judge Nelson's limited professional relationships with the victim's son and daughter-in-law were sufficiently attenuated that an informed, disinterested observer would not entertain significant doubt that justice would be done in Smith's sentencing. Prior decisions and judicial ethics opinions concerning similar situations support that conclusion.

¶17 In *Valencia,* we remanded for resentencing because the trial judge met with the victim's brother *ex parte* and discussed sentencing prior to sentencing the defendant to death. 124 Ariz. at 140, 602 P.2d at 808; *see also State v. Leslie*, 136 Ariz. 463, 463-64, 666 P.2d 1072, 1072-73 (1983) (remanding for a new trial after judge had telephone conversations with the victim's relatives prior to capital sentencing). In contrast, nothing here suggests that Judge Nelson ever spoke with either Terry or Jane Pray about Charles Pray's murder or the upcoming sentencing hearing.

¶18 Judicial Ethics Advisory Opinion 00-01, in which the Committee considered whether various situations required disqualification, provides additional guidance. *See* Ariz. Jud.

9

Ethics Adv. Comm. Op. 00-01 (2001). Opinion 00-01 and the opinions and cases cited therein considered instances in which a judge's spouse or child worked for a law firm or government agency that appeared before the judge although the judge's relative did not personally appear.[3] *Id*. at 1-2. The Committee concluded that the particular facts presented controlled the outcome in each situation, but then determined that none of the cases called for disqualification. *Id.*

¶19 Judge Nelson has a far more attenuated relationship with the Prays than the familial relationships discussed in Opinion 00-01. In addition, although our constitution considers Terry Pray a victim of Smith's crime and entitles him to attend any proceedings against Smith related to his father's murder, Mr. Pray did not participate in the sentencing hearing. *See* Ariz. Const. art. II, § 2.1.A.3. We conclude that the Code of Judicial Conduct did not require Judge Nelson's disqualification and find no error.[4]

---

[3] These situations are not specifically addressed by Canon 3.E, but resemble ones in which a judge's close relative acts as a lawyer in a proceeding before the judge, or when the judge knows that a relative has an interest that could be substantially affected by the proceeding. *See* Ariz. R. Sup. Ct. 81, Canon 3.E(1)(d)(ii-iii).

[4] Although we conclude that Judge Nelson's participation in the sentencing hearing did not constitute error, the better practice, particularly in a capital case, would have been to assign a judge from another county to conduct the resentencing hearing. Doing so apparently would have caused no difficulty in this matter. Rather than ask a judge from another county to hear only the motion for change of judge, the presiding judge could have assigned the action to a judge from another county for purposes of conducting

10

¶20     Judge Nelson denied Smith's request that a jury be impaneled to find aggravating factors.  Smith argues that this denial violated his right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution.

¶21     Smith was sentenced pursuant to A.R.S. section 13-703, which sets the procedure for sentencing in a case in which the State seeks the death penalty.  That procedure requires the sentencing judge to find the statutory factors that, if found to exist, qualify a defendant for capital punishment.  The procedure was declared constitutional in *Walton v. Arizona*, 497 U.S. 639 (1990), but placed in doubt by the Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  We recently described the procedure in detail, pointing out that *Apprendi* had not overruled *Walton* and that we therefore were required by the Supremacy Clause to uphold the Arizona sentencing procedure.  *State v. Ring*, 200 Ariz. 267, 279-80 ¶ 44, 25 P.3d 1139, 1151-52 ¶ 44 (2001).

¶22     The Supreme Court has now vacated our opinion in *Ring*. *Ring v. Arizona*, 122 S. Ct. 2428, 2443 (2002).  The Court held section 13-703 unconstitutional, insofar as it permits a judge to find the aggravating factors that permit imposition of the death penalty.  *Ring v. Arizona*, 122 S. Ct. at 2443.  We must therefore

the sentencing hearing.

11

hold that the sentencing judge in the present case erred in applying section 13-703.

¶23     The Court remanded *Ring* to us, and we must decide what is to be done on remand.  *See* Ariz. R. Crim. P. 31.23.c.  Given the *Ring* decision, Smith and all other defendants whose cases are pending on direct appeal must either be resentenced or their death sentences reduced to life with or without parole.  In some cases, there may be other issues, such as the possibility that the jury found the aggravating circumstance[5] or the State's contention of harmless error.  The decision is difficult because Arizona law now prescribes no procedure for sentencing or resentencing in capital cases.  It is therefore necessary to ask for briefing and argument on remand questions.

¶24     This case, however, is but one of many affected by the holding in *Ring v. Arizona*.  We therefore believe it best to consolidate this case and all others not yet final on direct appeal[6] for supplemental briefing and argument on the issues involving capital sentencing procedures.  We recently filed an order to that effect.  *State v. Ring*, Order, No. CR-97-0428-AP (June 27, 2002).

---

[5]     A case, for example, in which the aggravating factor was multiple homicides and the defendant was found guilty by jury verdict of each of the homicides.  *See* A.R.S. § 13-703.F.8.

[6]     The possible application of *Ring* to cases that are final and that come before our courts on post-conviction matters will be considered separately.

12

¶25     In the interim, before the final decision of the *Ring* issue, we have decided it would be in the best interests of all–the justice system, defendants, and victims–to issue opinions on all issues not arising out of application of A.R.S. section 13-703 in all cases that have been argued and submitted to the court for decision, including those in which we have concluded the verdict and judgment of guilt should be affirmed.

¶26     Thus, we end the discussion of sentencing issues at this point.  If Smith is to be resentenced again or his sentence reduced, all other sentencing issues are moot and need not be decided.  If it later appears that the other issues are not moot, they may be raised and considered when appropriate.  This opinion is therefore not a final disposition of this case and the time for filing a motion for reconsideration or for post-conviction relief has thus not begun to run.  In our discretion, however, suspending all contrary rules, any motion for reconsideration appropriately directed to the issues decided in this opinion should be filed as provided by the existing rules.  *See* Ariz. R. Crim. P. 31.18.

**IV.**

¶27     We reject the following arguments, which Smith raises to avoid procedural default and to preserve for further review.

¶28     The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article II,

13

Sections 1, 4, and 15 of the Arizona Constitution. *See State v. Sansing,* 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 ¶ 46 (2001); *State v. Rossi*, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985).

¶29     Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article II, Sections 1, 4, and 13 of the Arizona Constitution. *See Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132 ¶ 46.

¶30     The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Section 15 of the Arizona Constitution. *See State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 ¶ 59 (2001); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

¶31     The especially heinous, cruel, or depraved aggravating circumstance, A.R.S. section 13-703.F.6, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *See State v. Gretzler*, 135 Ariz. 42, 50, 659 P.2d 1, 9 (1983). Furthermore, upon resentencing, the State did not attempt to prove the existence of this aggravating factor, nor did the sentencing judge find it.

¶32     The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments of the

14

United States Constitution and Article II, Section 15 of the Arizona Constitution. *See Harrod,* 200 Ariz. at 320 ¶ 65, 26 P.3d at 503 ¶ 65; *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992).

¶**33**      Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate.  Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, Section 15 of the Arizona Constitution. *See State v. Ring,* 200 Ariz. at 284 ¶ 64, 25 P.3d at 1156 ¶ 64, *rev'd on other grounds by Ring v. Arizona*, 122 S. Ct. at 2443.

¶**34**      The pecuniary gain aggravating circumstance found in section 13-703.F.5 does not sufficiently narrow the class eligible for the death penalty, nor does it reasonably justify the imposition of a death sentence.  The court's interpretation of the scope of the F.5 factor is so broad that it cannot narrow the class of death eligible individuals.  Furthermore, pecuniary gain is such a frequent motive for murder that such a killing is not above the norm.  Therefore, the use of the pecuniary gain aggravating factor violates the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Section 15 of the Arizona Constitution. *See State v. Poyson*, 198 Ariz. 70, 82 ¶ 51, 7 P.3d 79, 91 ¶ 51 (2000).

¶**35**      Smith also raises the following issues to avoid procedural default.  Although we have previously rejected these arguments,

15

because they relate to the issues posed by the *Ring* decision, we withhold our rulings on them.

**¶36** The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed. The statute requires imposition of a death sentence if the sentencing court finds one or more aggravating circumstances and no mitigating circumstances substantial enough to call for life imprisonment. Furthermore, the death penalty serves no purpose that is not adequately addressed by life in prison. Therefore, it violates a defendant's right to due process under the Fourteenth Amendment of the United States Constitution and Article II, Sections 1 and 4 of the Arizona Constitution. *See State v. Pandeli*, 200 Ariz. 365, 382 ¶ 88, 26 P.3d 1136, 1153 ¶ 88 (2001); *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

**¶37** Arizona's death penalty scheme does not provide a defendant convicted of a capital crime the opportunity to death-qualify the sentencing judge, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Section 15 of the Arizona Constitution. *See Pandeli*, 200 Ariz. at 382 ¶ 89, 26 P.3d at 1153 ¶ 89.

**¶38** Section 13-703 provides no objective standards to guide the sentencing judge in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Section

16

15 of the Arizona Constitution. *See Pandeli*, 200 Ariz. at 382 ¶ 90, 26 P.3d at 1153 ¶ 90.

**¶39** Arizona's death penalty scheme is unconstitutional because it does not require the sentencing judge to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, violating the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, Sections 4 and 15 of the Arizona Constitution. *See Poyson*, 198 Ariz. at 83 ¶ 59, 7 P.3d at 92 ¶ 59.

**¶40** Section 13-703 does not sufficiently channel the sentencing judge's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, violating the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Section 15 of the Arizona Constitution. *See Pandeli*, 200 Ariz. at 382 ¶ 90, 26 P.3d at 1153 ¶ 90.

**V.**

**¶41** For the foregoing reasons, we approve Judge Johnson's denial of Smith's motion for change of judge and reserve decision regarding Smith's sentence.

_____
Ruth V. McGregor, Vice Chief Justice

17

CONCURRING:

_____
Charles E. Jones, Chief Justice


_____
Stanley G. Feldman, Justice


_____
Rebecca White Berch, Justice


_____
William J. O'Neil, Judge*


*Pursuant to Arizona Constitution Article VI, Section 3, the Honorable William J. O'Neil, Presiding Judge of the Arizona Superior Court, Pinal County, was designated to sit on this case.